# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CHRISTINE WEBSTER** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :      **NO. 3:04CV1265(DJS)** |
| | : |
| **POMPERAUG REGIONAL SCHOOL** | : |
| **DISTRICT 15** | : |
| | : |
| **Defendant.** | : |
| | : |

## MEMORANDUM OF DECISION

Plaintiff Christine Webster ("Webster") brings this action against defendant Pomperaug

Regional School District 15 ("Pomperaug") alleging violations of the Connecticut Unfair

Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq., the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111 et seq., Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794 et seq., and claims under 29 U.S.C. §§ 1983 and 1988 of Title 42

of the U.S. Code alleging violations of the First and Fourteenth Amendments.  On September 16,

2005, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Pomperaug filed a motion

for summary judgment on all counts of Webster's complaint.[1]  (See dkt. # 25.)  Webster has since

withdrawn her claims under 29 U.S.C. §§ 1983 and 1988 of Title 42 of the U.S. Code, which

---

[1]The court notes that Pomperaug also seeks summary judgment pursuant to Rule 56(a)(3) of the
Local Rules of Civil Procedure for the District of Connecticut ("D. Conn. L. Civ. R.").
Pomperaug argues that its motion for summary judgment should be granted because Webster, in
her Local Rule 56(a) statement, failed to provide specific citations to the record.  Since the
outcome of Webster's case would be the same under a Local Rule 56(a)(3) analysis and under a
discussion of the merits, the court shall, in the interest of judicial fairness, reach the merits of
Webster's claims.

allege violations of the First and Fourteenth Amendments. (See dkt. # 29.) For the reasons set forth herein, defendant's motion **(dkt. # 25)** is **GRANTED**.

## I.  FACTS

Webster is employed by Pomperaug as a secretary to the Guidance Department at Rochambeau Middle School.[2] She alleges that her employer discriminated against her on the basis of her repetitive use injury in her right hand, wrist, and arm. According to Webster, this condition resulted from the nature of her work.

As a secretary, Webster works under the general supervision of the Director of Guidance, the guidance counselors, and the school psychologist. Her duties include: performing usual office routines and practices, such as typing all correspondence, memos, reports, and purchase orders; operating all standard office equipment; typing and/or distributing transcripts, recommendations, class lists, and materials for awards assemblies; preparing numerous forms; acting as an intermediary for the administrator and counselors; and maintaining contacts with private agencies, professional persons, and other officials and groups. Other responsibilities include:  maintaining a regular filing system; maintaining a set of locked confidential files; processing incoming correspondence as directed; keeping statistical inventories and other records; maintaining academic records, report cards, grade sheets, progress reports and post-graduation plans; and keeping confidential files on PPT meetings current. Webster's position also requires her to compose, type, and sign correspondence; enroll new student applications; schedule appointments; arrange conferences; secure homework for absentees; and coordinate both college representative visitations and the scholarship process at the high school.

---

[2]Webster began working for Pomperaug as a "Secretary-Guidance" in August of 1997.

Webster claims that, beginning in January 2002, she started to experience pain and swelling in her right wrist. Thereafter, she sought treatment from a licensesed physical therapist, David Scopino ("Scopino"), who also happens to be her cousin. Despite her ailment, she continued to work and completed the 2001-2002 school year.

In addition to receiving treatment from Scopino, Webster also saw Stanley J. Foster, M.D., ("Dr. Foster"). On July 30, 2002, Dr. Foster concluded that Webster was suffering from flexor tendonitis in her upper right extremity. Dr. Foster performed an injection on Webster's wrist, prescribed a medication, and ordered that she wear an arm splint for two weeks. Thereafter, Webster sought treatment from Andrew J. Nelson, M.D., ("Dr. Nelson"). On August 13, 2002, Dr. Nelson issued a report, which excused Webster from work until further notice on account of the pain in her right hand.

When the summer break ended and the 2002-2003 school year began,[3] Webster did not return to work. In the interim, Webster continued to receive physical therapy from her cousin, Scopino. The parties agree that Dr. Nelson issued another report on October 7, 2002. The report recommended that Webster return to work part-time on light duty, effective October 8, 2002, and that she then return to work full-time, with allowances for therapy, effective October 21, 2002. The parties dispute whether Webster provided Pomperaug with Dr. Nelson's report. Webster maintains that she contacted, on October 7, 2002, the Assistant Superintendent for Business, Edward Arum ("Arum"). According to Webster, Arum told her, "don't come back to work until you hear from me." (Dkt. # 30, Ex. B.) She further asserts that Arum desired additional

_____

[3]As a secretary, Webster has the same ten-month work schedule as teachers, with time off during the summer.

information regarding her medical condition. Webster also claims that School Principal Lauren Robinson ("Robinson") told her, "[d]o not come back until you are 100%." (Dkt. # 30, Ex. B.)

In a letter dated November 7, 2002, from Arum to Scopino, Arum asks Scopino to explain his report of October 30, 2002. Specifically, Arum asks Scopino to elaborate upon his recommendations that Webster be provided with an ergonomically-correct workstation, that she receive short hourly breaks from fine motor repetitive tasks, and that she be given assistance with high volume, time-sensitive tasks.

The parties agree that Webster filed, in the fall of 2002, a Form C Notice of Worker's Compensation Claim against Pomperaug, alleging repetitive use injury to her right hand, wrist, and arm. The parties dispute whether, on December 13, 2002, Arum offered Webster an alternate position, that of instructional assistant. Pomperaug offers a letter dated December 13, 2002 , (see dkt. # 27, Ex. I-D), in support of this assertion. Arum's letter of December 13, 2002 states,

> Although he [Webster's physical therapist] acknowledges your workstation now meets the ergonomic stands he recommends (except for a shoulder extension for the telephone, which of course is no problem), he recommends [sic] indefinite restrictions that make it impossible for you to successfully perform the job, which you were hired. [sic]
> He recommends that we provide up to three breaks per hour up to ten minutes each. That means up to 30 minutes per hour of lost time, during which he cautions that no work can be performed. This would effectively make you a half time employee at full pay. In addition, he recommends at certain times, we provide a second employee to work with you, which would necessitate either the hiring of another secretary or the reassignment of one of your co-workers from her regular duties. . . .
> Further, your therapist offers no estimate of how long these accommodations would be necessary. . . .
> As I suggested in our meeting, there is another position within the school system I believe you could successfully fill, that of instructional assistant. While the only vacancy we now have is in a part time position, we feel we could increase

the hours to equate to your previous work schedule . . .The hourly rate for an instructional assistant is somewhat lower than the rate for your previous position. However, we are willing to work out agreements to protect you against any reduction in earnings.

(Id.)  Webster counters that the offer was for a part-time position, without benefits, and that if she took it, she would lose her seniority.

Thereafter, Webster sought treatment from Paul D. Fischer, M.D., ("Dr. Fischer").  On or about January 14, 2003, Dr. Fischer reported,

The patient [Webster] has not been back to work as yet but I would feel at this point that she is capable of returning to full duty noting that the recommendations put forth by Mr. David Scopino in his report suggesting that the patient take hourly breaks if needed are certainly appropriate and are within the normal recommendations for any employee performing long-term repetitive activity.  I would note that apparently the ergonomic station that the patient works at has already been improved which is the other aspect of preventing overuse type of symptoms in the work place allowing any worker to take short intermittent breaks for stretching and repositioning is one of the most effective ways of preventing development of overuse symptoms.

(Id., Ex. I-E.)

On February 10, 2003, Webster met with Robinson, Arum, School Counselor Marlene Silano ("Silano"), and School Psychologist Theresa Mentgen ("Mentgen").  They discussed Webster's return to work and provided Webster with a written job description of her job expectations.  On February 12, 2003, Webster returned to work.  She maintains that she was cleared to work at her usual job, without restrictions, provided she was given reasonable accommodations, including an ergonomically-correct work environment and regular breaks of the kind required for any employee performing long-term repetitive activity.

Webster argues that from the very first day she returned to work, she was met with severe harassment based upon her disability as well as a refusal to accommodate her disability.  She

accuses Pomperaug of deliberately reserving for her the type of assignments that were the most likely to exacerbate her disability and contends that Pomperaug failed to provide her with an ergonomically-correct work station. Webster also argues that Pomperaug refused to allow her to take breaks; subjected her to false accusations of incompetence and un-professionalism; and subjected her to a series of unjustified meetings in the spring of 2003.

Upon Webster's return to work, her supervisors, Silano and Mentgen, gave her a detailed list of tasks and a deadline for each item. Webster asserts that prior to her leave of absence she was not micro-managed in this manner. On Webster's second day back to work, February 13, 2003, Silano and Mentgen issued a memorandum to Webster, which served as a summary of a discussion Webster, Robinson, Silano, and Mentgen had on February 12, 2003. In the memorandum, Silano and Mentgen listed their concerns regarding Webster's lack of progress on the list of tasks they assigned to her on February 12, 2003. Silano and Mentgen also observed that Webster had left her work station in disarray and left confidential files out on her desk.

The parties dispute whether Webster failed to secure confidential student records on February 21, 2003. Pomperaug offers a memorandum dated February 21, 2003, from Silano and Mentgen to Arum. In the memorandum, Silano and Mentgen assert that Webster did not complete the assignments on her task list, left student files out in plain sight, left her work station in disarray, and made several spelling and grammatical errors on a form that Silano asked her to type. The memorandum also accused Webster of failing to meet with Silano and Mentgon to review her progress on the task list they assigned her. Webster claims that she did not receive a copy of this memorandum. Although Webster admits that she did not complete the assignments on the task list, she argues that the assignments on the list included typing-intensive tasks, which

were specifically saved for her.

Pomperaug further asserts that on March 5, 2003, Webster's supervisors again informed Webster of their concerns regarding her improper handling of confidential files. Webster disputes this assertion. Pomperaug offers a memorandum, dated March 5, 2003, from Silano, Mentgen, and Waterbury to Webster. The memorandum accuses Webster of making several errors on course recommendations, failing to write a satisfactory memo for another staff member, leaving her desk in disarray, and leaving confidential files unsecured. The memorandum warned Webster that if her performance did not improve, she would face disciplinary action. Two days later, on March 7, 2003, Mentgen issued another memorandum reprimanding Webster for again failing to secure confidential student records. Then, on March 14, 2003, Robinson issued a written warning to Webster, which listed six areas of concern relating to Webster's work performance. These areas included: work completion in a timely fashion; quality and accuracy of work completion; proper maintenance and storage of student records and confidential files; communication within the counseling department; maintaining a neat and orderly work environment; and professional conduct and interactions within the office setting. (Dkt. # 27, Exs. I-M.) The same day, Robinson met with Webster, Arum, and Webster's union representative, Peg Wildman ("Wildman"), to discuss the aforementioned areas of concern. Thereafter, on March 17, 2003, Arum sent Robinson, Webster, and Wildman a memorandum, which memorialized the meeting.

On March 28, 2003, Webster's supervisor, Mentgen, again admonished her. This time Webster was reprimanded for failing to secure Connecticut Mastery Test ("CMT") booklets. Although Webster concedes that this admonishment occurred, she argues that it was not her

responsibility to secure the CMT booklets.

The parties dispute whether on May 16, 2003, Webster refused to follow her supervisor's directive to re-file confidential and cumulative student records, which Webster had removed. In a memorandum dated May 23, 2003, Robinson advised Webster that she had improperly removed the student records from the eighth grade cumulative files because she had removed them before the school year ended, when the guidance counselors still needed immediate access to the records. Robinson gave Webster an additional week, until June 2, 2003 to re-file the records.

Thereafter, in a memorandum from Robinson to Webster, which was dated May 28, 2003, Robinson recommended that Webster receive a two-day suspension from her duties, without pay. According to Robinson, Webster had prematurely cleaned out student records form the eighth grade cumulative files and had placed them in a box marked "02-03 records to be shredded." (Dkt. # 27, Ex. I-Q.) Robinson inspected the box, and discovered that "many of the papers were documents that should not have been removed from the student files and if shredded would be in violation of state statutes. Included in these documents were student report cards, a confidential progress report on a student's IEP[4] goals and student registration information." (Id., Exs. I-Q.) With respect to the records, Webster asserts,

> The files that they are speaking of are the eighth grade files, these files are always cleaned out by the first term of the school years. . . .The papers that I take out of the files are papers that should have never been sent to the middle school at all. . . . As of 5/16/03 all but 2 students who needed evaluations were completed . . . the only new students out of 199 would be 4 that someone might need paperwork on. I was told that were [sic] I stored it was a closet, this is not true. I stored them in the paper room as I always did every year this rooms [sic]

---

[4]"IEP" stands for "Individual Education Program."

remains locked at all times.

(Dkt. # 30, Ex. B.)

Webster was suspended on June 10, 2003, for two days without pay. Webster argues that she was suspended in retaliation for having filed a complaint with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO") on or about March 7, 2003. The CHRO issued "A Release of Jurisdiction" on or about April 30, 2004.

Before Webster filed the instant lawsuit, Dr. Fischer issued a report, on approximately July 20, 2004, in which he opined, "She [Webster] is slightly weaker in grip as expected and given the carpal tunnel release as well as what appears to be intermittent but chronic flexor tenosynovitis I would assign an 8% permanent impairment of her right dominant hand. I would also state . . . that she should not be permitted to do any more than 6 hours of repetitive right and activity in any given 8 hour day." (Dkt. # 33, Ex. A.) According to Webster, her impairment caused her to have difficulty painting, gardening, shoveling, using the remote control, holding a cordless phone for a long period of time, lifting objects, baking, vacuuming, and washing her car. (See dkt. # 30, Ex. C.) Indeed, she asserts, "[m]y life has been altered in every way. I will always have problems with my right hand. That is my dominant hand, so there is pain whenever I have to use it." (Id.) In the instant lawsuit, Webster argues that she was subjected to severe harassment based upon her disability; that Pomperaug refused to accommodate her disability; and that she was suspended for two days in retaliation for having filed a complaint with the CHRO.

## II. DISCUSSION

Pomperaug asserts that it is entitled to summary judgment on all remaining counts of Webster's complaint because she was not physically "disabled," as that term is defined by the

ADA, the Rehabilitation Act, and the CFEPA.  Pomperaug further argues that Webster was not subjected to any discriminatory or retaliatory employment practices.  Webster denies these assertions and moves to strike paragraphs 15 and 16 of Pomperaug's Local Rule 56(a) Statement. The court shall first consider Webster's motion to strike.  Then, the court shall address Pomperaug's motion for summary judgment.

### A.  Webster's Motion to Strike

Webster moves to strike paragraphs 15 and 16 of Pomperaug's Local Rule 56(a) Statement on the ground that they contain legal conclusions and are not statements of alleged fact.  A motion to strike is appropriate if documents submitted in support of a motion for summary judgment are not made on the basis of personal knowledge or contain inadmissible hearsay or conclusory statements.  Pokorne v. Gary, 281 F. Supp. 2d 416, 418 (D. Conn. 2003); Spector v. Experian Info. Sys., No. 3:01-CV-1955, 2004 WL 1242978, at *4 (D. Conn. June 2, 2004).  "In ruling on a motion to strike, the court applies the Federal Rules of Evidence to determine whether evidence would be admissible at trial and thus whether a court can consider them in a ruling on a motion for summary judgment."  Glynn v. Bankers Life and Cas. Co., No. 3:02CV1802 (AVC), 2005 WL 2028698, at *1 (D. Conn. Aug. 23, 2005) (citing Raskin v. Wayatt Co., 125 F. 3d 55, 66 (2d Cir. 1997)).   Legal conclusions offered by both lay and expert witnesses are inadmissible.  See High v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992); Media Sport & Arts s.r.l. and Fed'n Internationale de Basketball v. Kinney Shoe Corp., No. 95 CIV. 3901(PKL), 1999 WL 946354, at *1 (S.D.N.Y. Oct. 1999).  In paragraphs 15 and 16 Pomperaug asserts that student records are subject to both the Family Educational Privacy Rights Act and the Connecticut General Statutes.  These are legal conclusions, and as such they are hereby stricken.

Accordingly, Webster's motion to strike paragraphs 15 and 16 of Pomperaug's Local Rule 56(a) Statement is **GRANTED**.

### B. Pomperaug's Motion for Summary Judgment

Pomperaug argues that it is entitled to summary judgment on all counts of Webster's complaint. For the reasons set forth herein, Pomperaug's motion is **GRANTED**.

### 1. Standard of Review

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burdens of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

2.  Americans with Disabilities Act Claim

Webster argues that Pomperaug discriminated against her because of her disability, i.e.,
the repetitive use injuries to her right hand, wrist, and arm, in violation of the ADA.  Pomperaug
counters that Webster does not have a "disability," as that term is defined by the ADA.  The court
finds that Pomperaug is entitled to summary judgment on Webster's ADA claim because
Webster has not set forth sufficient evidence to enable the court to conclude that she has a
disability within the meaning of the ADA.

The ADA provides that no covered entity "shall discriminate against a qualified
individual with a disability because of the disability of such individual in regard to job
application procedures, the hiring, advancement, or discharge of employees, employee
compensation, job training, and other terms, conditions and privileges of employment."  42
U.S.C. § 12112(a).  The ADA defines a "qualified individual with a disability" as "an individual
with a disability who, with or without reasonable accommodation, can perform the essential
functions of the employment position that such individual holds or desires."  42 U.S.C. §
12111(8).   To establish a prima facie case under the ADA, a plaintiff must show by a
preponderance of the evidence that: "(1) [her] employer is subject to the ADA; (2) [s]he was
disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the
essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he
suffered adverse employment action because of [her] disability."  Giordano v. City of New York,
274 F.3d 740, 747 (2d Cir. 2001).  The ADA also requires covered employers to provide
"reasonable accommodations to the known physical or mental limitations of an otherwise
qualified individual with a disability who is an applicant or employee, unless such covered entity

can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. §

12112(b)(5)(A).  Here, Pomperaug argues that Webster's disability discrimination claim fails

because Webster is not a "qualified individual with a disability."

Under the ADA, a disability is defined as:

(A) a physical or mental impairment that substantially limits one or more of the
major life activities . . . ;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  Guidelines promulgated by they Equal Employment Opportunity

Commission ("EEOC") delineate several factors to assist in determining whether a disability

comes within the protections accorded by the ADA, including the nature and severity of the

impairment, the duration or expected duration of the impairment, and the long-term impact

resulting from the impairment.  29 C.F.R. § 1630.2(j)(2).  Webster argues that she is disabled, as

that term is defined by the ADA, because she has a physical impairment that substantially limits

one or more of the her major life activities.[5]

The Supreme Court has articulated a three-part analysis for determining whether a

plaintiff has a disability under the first subsection of the ADA definition.  See Bragdon v. Abbott,

524 U.S. 624, 631 (1998).  "First, we consider whether [plaintiff has] a physical impairment.

Second, we identify the life activity upon which [plaintiff] relies . . . and determine whether the

impairment constitutes a major life activity under the ADA.  Third, tying the two statutory

phrases together, we ask whether the impairment substantially limited the major life activity."

---

[5]Webster does not rely upon subsection (B) or (C) of § 120102(2). Thus, she does not argue that
she satisfies the ADA's definition of disability because she had "a record of such an impairment"
or because she was "regarded as having such an impairment."

Id.; accord Colwell v. Suffolk Cty. Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998).  The Second

Circuit has ruled that the ADA's requirement that a physical disability substantially limit a major

life activity is a "significant threshold for seeking redress under the ADA."  Felix v. N.Y. City

Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003).

In this case, Pomperaug does not challenge Webster's contention that her repetitive use

injuries to her right hand, wrist, and arm qualify as a physical impairment; rather Pomperaug

asserts that plaintiff cannot prove that her physical impairment substantially limits a major life

activity.  In Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), the

Supreme Court found that "[m]erely having an impairment does not make one disabled for

purposes of the ADA.  Claimants also need to demonstrate that the impairment limits a major life

activity."  Id., at 195.  Indeed, in Toyota, the Supreme Court explained that because there are

"large potential differences in the severity and duration of the effects of carpal tunnel syndrom,

an individual's carpal tunnel syndrom diagnosis, on its own does not indicate whether the

individual has a disability withing the meaning of the ADA."  Id., at 199.  Thus, Webster cannot

show that she is disabled, as that term is defined by the ADA, by merely showing that she has

been diagnosed with repetitive use injuries to her right hand, wrist, and arm.  Rather, Webster

must show that her physical impairment substantially limits her ability to perform major life

activities.

The term "major life activities" includes "functions such as caring for oneself, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  Colwell,

158 F.3d at 642.  When "deciding whether a particular activity is a 'major life activity,' [the

court] ask[s] whether that activity is a significant one within the contemplation of the ADA,

rather than whether that activity is important to a particular plaintiff." Colwell, 158 F.3d at 642. Webster argues that she was substantially limited in the major life activity of performing manual tasks.[6] Indeed, in her responses to defendant's interrogatories, (see dkt. # 30, Ex. C), she asserts that her impairment caused her to have difficulty painting, gardening, shoveling, using the remote control, holding a cordless phone for a long period of time, lifting objects, baking, vacuuming, and washing her car. Painting, gardening, and shoveling do not qualify as major life activities. See Colwell, 158 F.3d at 643 (finding that painting, doing yard work, and shoveling snow fall outside the range of "major" life activities). The court finds that using a remote control and holding a cordless phone for a long period of time are not major life activities. The court is guided by "[t]he plain meaning of the word 'major[,]' [which] denotes comparative importance and suggest[s] that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." Bragdon, 524 U.S. at 638 (internal quotations omitted). For the purposes of this motion, the court shall assume, without deciding that lifting objects and performing basic household chores, such as baking, vacuuming, and washing a car do qualify as major life activities. See Colwell, 158 F.3d at 643 (finding that performing housework other than basic chores is not a major life activity and assuming without deciding that lifting qualifies as a major life activity). The protections of the ADA only apply, however, when it is demonstrated

---

[6]The court observes that Webster does not contend that she was substantially limited in the major life activity of working, which would require her to show that she was substantially limited in her ability to perform a broad range of jobs. 29 C.F.R. § 1603.2(j)(3)(i); Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 154 (2d Cir. 1998). The court further notes that Webster has not shown that she was substantially limited in her ability to perform a broad range of jobs. In addition, she does not dispute that, on or about January 14, 2003, Dr. Fischer reported that she was "capable of returning to full duty with normal hourly breaks for stretching and repositioning." (Dkt. # 27, Exs. I, I-E; dkt. # 39.)

that the disability of the individual "substantially limits" a major life activity.

"[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment must also be permanent or long term." Toyota Motor, 534 U.S. at 198. The ADA requires an "individualized inquiry" to determine whether an impairment substantially limits one or more major life activities. Sutton, 527 U.S. 471. For instance, in Toyota Motor, the Supreme Court concluded that plaintiff's medical impairments, which caused her "to avoid sweeping, quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances . . . . did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives." Id., at 202. Here, Webster cannot show that her repetitive use injury substantially limits her ability to partake in activities that are of central importance to most people's daily lives.[7] She makes only brief references to her difficulty in lifting objects and performing household chores. Although she asserts, "[m]y life has been altered in every way. I will always have problems with my right hand. That is my dominant hand, so there is pain whenever I have to use it," (dkt. # 30, Ex. C), she offers no evidence regarding the severity of her impairment or how she was impeded in effectuating activities that

---

[7]The court further observes although the ADA requires an "individualized inquiry" to determine whether an impairment substantially limits one or more major life activities, "courts in this Circuit that have examined this issue and found that by and large carpal tunnel syndrome or similar limitation on repetitive motion to do not substantially limit a major life activity." Ruhling v. Tribune Co., No. CV04-2430(ARL) 2007 WL 28283, at * 12 ( E.D.N.Y. Jan. 3, 2007) (collecting cases); see also Cutler v. Hamden Bd. of Educ., 150 F. Supp. 2d 356 (D. Conn. 2001) (citing more than fifteen cases granting summary judgment where plaintiff alleged an impairment of carpal tunnel syndrome but failed to demonstrate that she was substantially limited in a major life activity.)

are of central importance to most people's daily lives. Indeed, Webster's case is analogous to

Balonze v. Town Fair Tire Centers, Inc., No. 3:02cv2247(WWE), 2005 WL 752198 (D. Conn.

Mar. 31, 2005). In Balonze, the court found that, as a matter of law, a plaintiff with a partial

disability rating of 17% to the right master index finger or 3% to the right master hand was not

disabled even though she testified that she had trouble opening jars, braiding her daughter's hair,

lifting objects, and folding clothes. Id., at *7. Moreover, Webster, has not offered any evidence

as to the extent to which her use her of right hand, wrist, and arm are limited in a substantial way.

She has offered some evidence of her physical limitation, (see dkt. # 30), but the extent or

severity of these physical limitations do not rise to the level of a disability in major life activity.

Cf. Jotblad v. City of St. Paul, No. Civ. 04-4009 (JRT/FLN), 2006 WL 208780 (D. Minn. Jan.

25, 2006) (finding that a plaintiff who had severe carpal tunnel syndrome, which rendered her

right thumb almost useless and caused her to have several surgeries, was substantially limited in

the major life activities of doing the laundry, fixing her hair, and holding a glass). Thus, even

though Dr. Fischer assigned an 8% permanent impairment to Webster's right dominant hand,

(see dkt. # 33, Ex. A.), the diagnosis of an 8% permanent impairment, alone, does not show that

Webster is substantially limited in her ability to perform major life activities. Indeed, Webster

fails to offer any evidence comparing her ability to lift objects and perform household chores to

the capabilities of an average person. See Colwell, 158 F. 3d at 644 (concluding that testimony

that plaintiff could not lift "very heavy objects" did not support a finding of substantial

limitation). Nor does Webster offer any evidence regarding whether she could tend to her own

personal hygiene. See Toytota Motor, 534 U.S. at 186 (focusing on whether claimant could tend

to her own personal hygiene or carry out personal or household chores). Here, the record

evidence indicates that Webster was cleared for work and was still able to groom herself and "to perform all necessary household chores, although perhaps not as easily as she once was able." Munck v. New Haven Savings Bank, 251 F. Supp. 2d 1978 (D. Conn. 2003) (finding that the plaintiff was not substantially limited in performing manual tasks even though she had difficulty pulling in a line of laundry, needed to rest after vacuuming, could not lift more than 20 or 30 pounds, and had difficulty performing repetitive motions on the right side of her body).

Furthermore, the court finds that Webster's assertions are too vague to support a finding that she is restricted in her ability to lift objects compared to the average person. "It is plaintiff's burden on summary judgment to come forward with evidence that indicates that she could meet her ultimate burden of showing an ADA recognized disability." Balonze, 2005 WL 752198 at *7. Here, Webster has not met her burden because she has failed to show the degree to which her repetitive use injury in her right hand, wrist, and arm limited her ability to lift, perform household chores, and tend to her own personal hygiene. Webster, who has an impairment akin to carpel tunnel, has not demonstrated that her impairment impeded upon her ability to partake in activities that are of central importance to most people's daily lives. Indeed, the record does not support Webster's claim that her impairment substantially limited any major life activity. Thus, Webster has not met her burden of showing that her impairment rises to the level of a disability under the ADA and Pomperaug is entitled to summary judgment on this claim.

### 3. Rehabilitation Act Claim

Webster claims that Pomperaug discriminated against her because of her disability, i.e., the repetitive use injuries to her right hand, wrist, and arm, in violation of the Rehabilitation Act. Pomperaug counters that Webster does not have a "disability," as that term is defined by the

18

Rehabilitation Act. Because Webster's ADA claim fails, her Rehabilitation Act claim also fails. Section 504 of the Rehabilitation Act, provides: "No otherwise qualified individual with a disability in the United States shall, solely by reason of her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The Rehabilitation Act defines the term "individual with disability" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). Just as with Webster's ADA claim, Webster only maintains that she has a physical impairment that substantially limits one or more major life activities.[8]

In determining whether one is disabled, a court must determine whether the plaintiff has a physical or mental impairment and then analyze whether such impairment substantially limits one or more of that person's major life activities. "[T]he Rehabilitation Act and Titles II and III of the ADA prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." Powell v. National Bd. of Medical Examiners, 364 F.3d 79, 85 (2d Cir. 2004). "The language of the two statutes is substantially same." Hernandez v. City of Hartford, 959 F. Supp. 125, 129 (D. Conn. 1997). Indeed, the Second Circuit has observed that "[s]ince the standards adopted by Titles II and III of the ADA are, in most cases, the same as those required under the Rehabilitation Act . . . , we consider the

---

[8]Webster does not argue that she has a record of such impairment or that she is regarded as having such an impairment.

merits of these claims together." Powell, 364 F.3d at 85 (internal citation omitted). Thus, for a plaintiff to establish a prima facie violation of these Acts, she must demonstrate that: (1) she is a "qualified individual" with a disability; (2) the defendant is subject to one of the Acts; and (3) she was "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by defendants by reason of her disability." Powell, 364 F.3d at 85. As previously discussed, see supra II.B.2, Webster cannot establish that she "is a qualified individual with a disability." Thus, Webster cannot make out a prima facie case of disability discrimination and Pomperaug is entitled to judgment as a matter of law on Webster's claim that it discriminated against her in violation of the Rehabilitation Act.

### 4. The CFEPA Discrimination Claim

Webster claims that Pomperaug discriminated against her on the basis of her disability in violation of the CEFPA. Pomperaug argues that it is entitled to summary judgment because (1) Webster was not physically disabled, and (2) Webster was not subjected to any discriminatory employment practices. Under the CFEPA, it is a discriminatory employment practice "to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . physical disability. . . ." Conn. Gen. Stat. § 46a-60(a)(1). "The CFEPA has also been interpreted to require an employer to reasonably accommodate disabled employees." Hill v. Pfizer, Inc., 266 F. Supp. 2d 352, 364 (D. Conn. 2003); Trimachi v. Conn. Workers' Comp. Comm., No. CV970403037, 2000 WL 872451 (Conn. Super. Ct. 2000 June 14, 2000). Disability discrimination claims brought under the CFEPA are construed similarly to those brought under the ADA, see Levy v. Comm'n on Human Rights & Opportunities, 236

20

Conn. 96, 103-04 (Conn. 1996), with the Connecticut courts reviewing federal precedent

concerning employment discrimination for guidance in enforcing the CFEPA. Wroblewski v.

Lexington Gardens, Inc., 188 Conn. 44, 53 (1982); Pik-Kwik Stores, Inc., v. Comm'n on Human

Rights & Opportunities, 170 Conn. 327, 331 (1976); Ford v. Blue Cross & Blue Shield of

Connecticut, Inc., 216 Conn. 40, 53 (1990).  Indeed, Connecticut courts employ the burden

shifting framework of  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Levy,

236 Conn. at 103-04.  Thus, to establish a prima facie case, the plaintiff must prove that: (1) she

is in the protected class; (2) she was qualified for the position; (3) she suffered an adverse

employment action; and (4) that the adverse action occurred under circumstances giving rise to

an inference of discrimination.  Bd. of Educ. of the City of Norwalk v. Comm'n on Human

Rights and Opportunities, 266 Conn. 492, 505 (2003).  "The level of proof required to establish a

prima facie case is minimal and need not reach the level required to support a jury verdict in the

plaintiff's favor."  Craine v. Trinity Coll., 259 Conn. 625, 639 (2002).  If a plaintiff meets this

initial burden of establishing a prima facie case of discrimination, the defendant must then offer a

legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must

demonstrate pretext.  Ford, 216 Conn. at 53-54.

Pomperaug argues that it is entitled to summary judgment because the plaintiff is not

"physically disabled" and thus is not a member of the protected group.  The CFEPA definition of

disability, however, is broader than that of the ADA.  Worster v. Carlson Wagon Lit Travel, Inc.,

353 F. Supp. 2d 257, 267 (D. Conn. 2005).  Indeed, the Second Circuit has held that the ADA

has an additional requirement that is absent from the CFEPA definition.  Beason v. United

Technologies Corp., 337 F.3d 271 (2d Cir.2003).  "The CFEPA defines the term [p]hysically

disabled as refer[ring] to any individual who has any chronic physical handicap, infirmity, or impairment . . . . The ADA also prohibits disability-based discrimination and similarly defines disability as a physical or mental impairment. But, significantly, it adds a requirement that the impairment substantially limit[s] one or more of the major life activities of [the] individual." Id. at 276-77 (Citation omitted; internal quotation marks omitted). In Beason, the Second Circuit further observed, "[a]bsent similar language in the CFEPA, we believe the Connecticut Supreme Court would decline to find the CFEPA possesses the same restrictive threshold," Id. at 277, and that

> [g]iven that the definition of disability used by the ADA essentially pre-dates the definition of physical disability promulgated by the Connecticut General Assembly, for the CFEPA, the General Assembly, had it wished to do so, could have adopted the ADA definition. The fact that the General Assembly chose not to adopt that language readily supports an inference that the Connecticut legislature appreciated the scope of the ADA definition and intended the CFEPA definition to be different.

Id. at 277-78. Here, Pomperaug argues that Webster is not physically disabled, as that term is defined by the CFEPA because, according to Pomperaug, Webster suffers from a temporary wrist injury, which improved with treatment. In support of this argument, Pomperaug relies upon Dr. Nelson's report of October 7, 2002 and Dr. Fischer's report of January 14, 2003. Dr. Nelson's report of October 7, 2002 recommended that Webster return to work part-time on light duty, effective October 8, 2002, and that she then return to work full-time, with allowances for therapy, effective October 21, 2002. Dr. Fischer's report of January 14, 2003 observed,

> The patient [Webster] has not been back to work as yet but I would feel at this point that she is capable of returning to full duty noting that the recommendations put forth by Mr. David Scopino in his report suggesting that the patient take hourly breaks if needed are certainly appropriate and are within the normal recommendations for any employee performing long-term repetitive activity. I would note that apparently the ergonomic station that the patient works at has

already been improved which is the other aspect of preventing overuse type of symptoms in the work place allowing any worker to take short intermittent breaks for stretching and repositioning is one of the most effective ways of preventing development of overuse symptoms.

(Dkt. # 27, Exs. I-E.)  The court observes, however, that the record also reflects that Dr. Fischer subsequently assigned an 8% permanent impairment to Webster's right dominant hand.  (See dkt. # 33, Ex. A.)  With respect to whether Webster's injury qualifies as a physical handicap, infirmity, or impairment, the court finds instructive the case of Gilman Brothers Co., v. Connecticut Comm'n on Human Rights and Opportunities, No.CV950536075, 1997 WL 275578 (Conn. Super. Ct. May 13, 1997).  In that case, the Superior Court of Connecticut found that an individual with carpel tunnel syndrome and tendonitis was suffering from a chronic physical impairment, as defined by the CFEPA.  Here, Webster has met her de minimis burden of showing that she is physically disabled,[9] because the record reflects that she suffers from flexor tendonitis in her upper right extremity.  Moreover, Dr. Fischer's diagnosis of an 8% permanent impairment to Webster's right dominant hand indicates that this is not a temporary ailment.  (Id.) Accordingly, Webster has shown that she is a member of the protected class.  The parties do not dispute that Webster satisfies the second and third elements of the prima facie case.  Pomperaug next argues that Webster has not satisfied the fourth part of the prima facie case-that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination. Webster counters that Pomperaug did not have a legitimate basis to suspend her, because according to Webster, she removed the confidential student records from the eighth grade cumulative files, in accordance with past office procedure.  Since Webster's burden when

---

[9]Section 46a-51(15) reads, "'[p]hysically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment. . . ."  Conn. Gen. Stat. § 46a-51(15).

making out a prima facie case is minimal, the court finds that Webster has met her burden at this stage in the analysis.[10]

Pomperaug has adduced evidence showing that as a secretary assigned to the guidance office, Webster was responsible for "maintain[ing] a regular filing system as well as a set of locked confidential files;" "maintain[ing] academic records, report cards, grade sheets, progress reports, and post-graduation plans;" and "keeping up to date confidential files on PPT meetings." (See dkt. # 27, Exs. I-G.) She was also required to have a "thorough knowledge of policies and procedures of the assigned work" and "considerable knowledge of the office management and standard record maintenance procedures." (Id.) Pomperaug further offers evidence showing that Webster's supervisors discussed file maintenance with Webster on February 12, 2003, February 21, 2003, March 5, 2003, March 7, 2003, March 14, 2003, and March 17, 2003. In addition, on March 28, 2003, Webster was admonished for failing to secure Connecticut Mastery Test booklets. Lastly, Pomeraug offers evidence showing that Webster was suspended for two days without pay because she prematurely removed student files from their cumulative folders, while school was still in session, and then refused to re-file the records even though these student

_____

[10]To the extent Webster seeks to establish a CFEPA claim based upon Pomperaug's failure to accommodate her disability, her claim fails because other than vaguely asserting, in her CHRO complaint, that "[t]he defendant refused to allow the plaintiff to take the breaks required by her disability," (see dkt.# 30, Ex. A), the record is devoid of any evidence indicating whether Pomperaug denied Webster the accommodations she requested. Indeed, a review of the record evidence reveals that once Webster returned to work, she did not make any complaints regarding accommodations. She has not adduced any evidence indicating specific instances when Pomperaug refused to allow her to take breaks. Nor has she offered any evidence showing that she confronted Pomperaug about the adequacy of ergonomic equipment after she returned to work. See Rogers v. First Union National Bank, 259 F. Supp. 2d 200, 204 (D. Conn. 2003) ("when a motion for summary judgment is made and supported as provided in [Rule 56], and adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings; . . . .").

records should not have been purged until after the students left school in June.

Under the McDonnell Douglas framework, as noted above, Webster has the burden of the putting forth evidence from which a reasonable juror could infer that Pomperaug's rationale was a mere pretext for disability discrimination. "The plaintiff then must satisfy her burden of persuading the factfinder that she was the victim of discrimination 'either directly by persuading the court [or jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Ford, 216 Conn. at 54 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Webster argues she was falsely accused of improperly handling confidential files and that Mentgen did not have any legitimate basis for admonishing her for failing to secure the CMT booklets. Indeed, she asserts that procedures, which had been approved as proper procedures in the past, were used as the basis for disciplinary action against her. Webster does not dispute, however, that she was responsible for "maintain[ing] a regular filing system as well as a set of locked confidential files . . . ." "maintain[ing] academic records, report cards, grade sheets, progress reports, and post-graduation plans;" and "keeping up to date confidential files on PPT meetings." (See dkt. # 27, Exs. I-G.) Nor does she dispute that she was required to have a "thorough knowledge of policies and procedures of the assigned work" and "considerable knowledge of the office management and standard record maintenance procedures." (Id.) With respect to leaving files out on her desk, Webster argues, that in accordance with standard office procedure, she was never to file an incomplete file. As such, Webster claims that she left files she was currently working on out on her desk. The record reflects, however, that prior to Webster's leave of absence, as early as November 1998, Pomperaug had addressed the procedure

for the filing of student records in the guidance department. Minutes from a guidance department meeting read, "[w]e discussed the necessity for the Guidance Secretary's desk to be cleared everyday before she leaves due to staff members and students using her telephone. The reason for this is that the counselors are not always available to monitor the desk and files which contain confidential information." (Dkt. # 33, Ex. B.) As Webster began working for Pomperaug as a "Guidance-Secretary" in August of 1997, and her job description required her to have a "considerable knowledge of the office management and standard record maintenance procedures," Webster should have been aware of this procedure. Moreover, even assuming Webster was not aware of this policy, the record reflects that Webster's supervisors repeatedly told her not to leave confidential student files out on her desk overnight. Webster offers no evidence indicating whether she modified her behavior to comply with her supervisors' instructions.

With respect to the removal of the student records from the eighth grade cumulative records, Webster concedes that she removed the files and that Principal Robinson told her to re-file the records. Moreover, Webster's statement regarding her removal of the files does not address Pomperaug's argument that she should not have removed the files while the students were still in school. Webster argues,

> The files that they are speaking of are the eighth grade files, these files are always cleaned out by the first term of the school years. . . .The papers that I take out of the files are papers that should have never been sent to the middle school at all. . . . As of 5/16/03 all but 2 students who needed evaluations were completed . . . the only new students out of 199 would be 4 that someone might need paperwork on. I was told that were [sic] I stored it was a closet, this is not true. I stored them in the paper room as I always did every year this rooms [sic] remains locked at all times.

(Dkt. # 30, Ex. B.)  Accordingly, the court finds that Webster has not presented sufficient evidence from which a jury could reasonably conclude that defendant's reasons for her suspension were pretextual and that the real reason was discriminatory.

Even assuming that Webster could establish pretext, which she has not, Webster's disability discrimination claim fails because she cannot satisfy her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000).  Other than Webster's membership in the protected class, she has adduced no evidence showing that Pomperaug discriminated against her because of her disability.  See Craine, 259 Conn. at 647 (finding that plaintiff failed to adduce sufficient evidence to prove discrimination even though the plaintiff satisfied the requirements of a prima facie case and observing, "although the plaintiff satisfied the de minimis requirement for a prima facie case, she did not present evidence particularly probative of discrimination when doing so."). Construing the evidence in a light most favorable to Webster, the actions of her co-workers may have offended and annoyed her, but, absent overtones of disability discrimination, these actions are not illegal discrimination.  See Schnabel v. Abramson, 232 F.3d 83, 91(2d Cir. 2000) ("summary judgment was appropriate in the case at bar, for plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that age was a determinative factor in defendants' decision to fire him.").  Pomperaug has demonstrated that it is entitled to judgment as a matter of law.  Webster has offered a weak prima facie case of discrimination and no other evidence that Pomperaug's or her supervisors' actions were motivated by disability discrimination.  Therefore, there is no issue of material fact for a jury to decide.  Pomeperaug's motion for summary judgment is granted with respect to

Webster's CFEPA claim.

### 5.  Federal Retaliation Claims

Webster alleges that Pomperaug retaliated against her in violation of the ADA and Section 504 of the Rehabilitation Act.  According to Webster, Pomperaug retaliated against her by subjecting her to harassment, false allegations, and a two-day suspension.  Retaliation claims brought pursuant to the ADA and the Rehabilitation Act are analyzed using the same burden-shifting framework  used in Title VII cases.  Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002).  To state a prima facie case of retaliation under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that "(1) he or she engaged in an activity protected by the [Act]; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him or her; and (4) a causal connection exists between the alleged adverse action and the protected activity."  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  A plaintiff's burden at the prima facie stage is de minimis.  Id.; see Richardson v. New York State Dep't. of Correctional Serv., 180 F.3d 426, 444 (2d Cir.1999).  "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Cifra v. G.E. Co., 252 F.3d 205, 216 (2d. Cir. 2001).

Webster has produced sufficient evidence to satisfy her de minimis burden of establishing a prima facie case of retaliation.  First, her requests for accommodations and her filing of a complaint with the CHRO constitutes protected activity.  See Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999) (finding that a retaliation claim can be based on, inter alia, a request for

reasonable accommodation); <u>Treglia</u>, 313 F. 3d 713, 720 (finding protected activity includes filing state administrative charges).  Second, Webster has shown that Pomperaug was aware of both her request for reasonable accommodations and her CHRO complaint.  For instance, Arum's letter of December 13, 2002, indicates that as of that date, Pomperaug was aware of Webster's requests for reasonable accommodations.  Pomperaug's verified answer to Webster's CHRO complaint demonstrates that it received notice of Webster's CHRO complaint on or about March 26, 2003.  (<u>See</u> dkt. # 33, Ex. B.)  Third, Webster established that she suffered an adverse employment action when she received a written reprimand on May 28, 2003, which resulted in a two-day suspension.[11]  <u>See</u> <u>Burlington Northern and Santa Fe Ry. Co. v. White,</u> 126 S.Ct. at 2415 (announcing a new standard for determining the existence of an adverse employment action in retaliation claims and holding that to be "materially adverse" an employment action must "dissuade[] a reasonable worker from making or supporting a charge of discrimination"); <u>see</u> <u>also</u> <u>Kessler v. Westchester County Dep't. of Social Services</u>, 461 F.3d 199, 207 (2d Cir. 2006) (recognizing the new standard).  Finally, Webster has presented sufficient evidence to show that there was a causal connection between her protected activities and the suspension.  "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  <u>Cifra,</u> 252 F.3d at 217 (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Treglia</u>, 313 F. 3d at 720 (finding a causal connection where many of the alleged adverse employment actions took place within a few

─────────────────────────

[11]In addition, the court observes that Pomperaug's actions constituted adverse employment actions even under the <u>pre-Burlington Northern</u> standard.  <u>See</u> <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999) (observing, "adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.").

months of plaintiff's alleged complaints).  Although the Second Circuit has not set a bright line

rule as to when the temporal link becomes too attenuated to demonstrate causation, <u>see</u>

<u>Gorman-Bakos v. Cornell Co-op. Extension of Schenectady County</u>, 252 F.3d 545, 554 (2d

Cir.2001), many courts have found that time period of 6 months to a year between the time of the

protected conduct and the time of the adverse employment action suggest a casual relationship

between the two.  <u>See</u> <u>Grant v. Bethlehem Steel Corp.</u>, 622 F.2d 43, 45-46 (2d Cir. 1980) (8

month gap between filing of EEOC complaint and retaliatory action suggested a causal

relationship); <u>Suggs v. Port Authority of N.Y. & N.J.</u>, 97civ4026 (RPP), 1999 WL 269905, at * 6

(S.D.N.Y.) (termination 6 months after plaintiff filed and EEOC charge was "sufficiently close in

time to raise an inference of retaliation"); <u>Bernhardt v. Interbank of N.Y.</u>, 18 F. Supp. 2d 218,

226 (E.D.N.Y. 1998) (11 months between protected activity and termination might suggest

causal link where defendant had reasons for delaying termination);  <u>Rieger v. Orlor, Inc.</u>, 427 F.

Supp. 2d 105, 121(D. Conn. 2006) (finding that plaintiff had adduced sufficient evidence to show

a causal connection when 9 months elapsed between plaintiff's protected activity and the adverse

employment action).  Here, Webster has produced sufficient evidence to show a causal

connection based upon temporal proximity because she requested, in approximately December

2002, accommodations for her disability and then filed a complaint with the CHRO on or about

February 28, 2003.  She was reprimanded on May 28, 2003, and was suspended on June 10,

2003, for two days without pay.  These events are sufficiently close in time to establish a causal

connection.  Accordingly, Webster has established a <u>prima</u> <u>facie</u> case of retaliation.

Because Webster has set forth a <u>prima facie</u> case of retaliation, the burden shifts back to

Pomperaug to articulate a legitimate, non-retaliatory reason for the challenged employment

decision.  Pomperaug has articulated legitimate, non-retaliatory reasons for the adverse

employment action.  Specifically, Pomperaug has adduced evidence showing that it suspended

Webster for her failure to properly secure confidential student records, as required by

Pomperaug's policies and procedures.  Pomperaug has also produced evidence showing that prior

to her suspension, Webster received several written warnings reminding her to properly secure

confidential student files.  Thus, the burden shifts to Webster to point to evidence that would be

sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a

pretext for impermissible retaliation.

Although Webster argues that she removed the confidential student records from the

eighth grade cumulative files because she had been instructed to do so, she offers no evidence in

support of this assertion, other than her unsigned affidavit.  (See dkt. # 30, Ex. B.)  In addition,

Webster does not dispute that the student records, which she removed before the school year

ended, were confidential files and that the school principal, Robinson, instructed her to re-file the

records so that the guidance counselors could access these records during the school year.

Webster offers no evidence as to whether she complied with this directive.  Webster also does

not challenge the record evidence proffered by Pomperaug, which reveals that Webster had

removed certain records and placed them in a box to be shredded, even though school policy was

to retain those records.  Indeed, with respect to the records, Webster asserts,

> The files that they are speaking of are the eighth grade files, these files are always
> cleaned out by the first term of the school years. . . . The papers that I take out of
> the files are papers that should have never been sent to the middle school at
> all. . . .  As of 5/16/03 all but 2 students who needed evaluations were
> completed . . . the only new students out of 199 would be 4 that someone might
> need paperwork on.  I was told that were [sic] I stored it was a closet, this is not
> true.  I stored them in the paper room as I always did every year this rooms [sic]

remains locked at all times.

(Dkt. # 30, Ex. B.)  Webster admits that as a "Guidance-Secretary," she was responsible for maintaining a regular filing system; maintaining a set of locked confidential files; maintaining academic records, report cards, grade sheets, progress reports and post-graduation plans; and keeping confidential files on PPT meetings current.  Accordingly, Webster cannot show pretext because her allegations do not cast any doubt on the Pomperuag's assertions.

Even assuming that Webster could establish pretext, which she has not, Webster's claim still fails because she has not adduced any evidence from which a reasonable trier of fact could infer that Pomperaug reprimanded and suspended Webster because she participated in protected activities.  "The final burden rests on the plaintiff to prove not only that the proffered . . . reason as pretextual but also that defendant [retaliated] against the plaintiff."  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001).  "The test for summary judgment is whether the evidence can reasonably support a verdict in plaintiff's favor."  James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).  Even if Pomperaug's asserted reason is false, no reasonable jury could conclude, based on the record as a whole, that the plaintiff was terminated in retaliation for requesting accommodations or filing a complaint with the State of Connecticut Commission on Human Rights and Opportunities.  Indeed, the record reveals that Pomperaug provided Webster with an ergonomically-correct work station upon Webster's return to work and warned Webster several times to properly handle student files before suspending her.  Accordingly, Pomperaug's motion for summary judgment on Webster's federal retaliation claims is granted.

6.  The CFEPA Retaliation Claim

To the extent Webster asserts a retaliation claim under the CFEPA, her claim fails.
Retaliation claims brought pursuant to the CFEPA are analyzed in the same manner as Title VII
retaliation claims.  See Brittell v.Dep't of Correction, 247 Conn. 148, 164 (Conn. 1998).  In
addition, as previously discussed, retaliation claims brought pursuant to the ADA and the
Rehabilitation Act are analyzed using the same framework  used in Title VII cases.  Weixel, 287
F.3d at 148.  Thus, Pomperaug is entitled to summary judgment on Webster's state law
retaliation claim because, as previously discussed, see infra II.B.5.a; Webster has not produced
sufficient evidence to permit a rational factfinder to conclude that Pomperaug's explanation is
merely a pretext for impermissible retaliation.

### III.  CONCLUSION

For the forgoing reasons Webster's motion to strike paragraphs 15 and 16 of
Pomperaug's Local Rule 56(a) Statement is **GRANTED**.  Pomperaug's motion for summary
judgment **(dkt. # 25)** is **GRANTED.**  Judgment shall enter for the defendant on all counts of the
complaint.  The Clerk of the Court shall close this file.


So ordered this ____30th_____ day of March, 2007.


                                              **/s/DJS**
                                    _____
                                    **DOMINIC J. SQUATRITO**
                                    **UNITED STATES DISTRICT JUDGE**